IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KARL N. BLACKWELL,        )
                                )
      Plaintiff,          )
                                )
v.                       )         Civil Action No. 3:20CV286–HEH
                                )
DOCTOR JAMES CANE, *et. al*,   )
                                )
      Defendants.      )

## MEMORANDUM OPINION
### (Granting Motion for Summary Judgment)

Karl N. Blackwell, a Virginia inmate proceeding *pro se* and *in forma pauperis*,

filed this 42 U.S.C. § 1983 action in which he alleges Dr. James Cane and Nurse

Practitioner Tarasova ("Defendants") denied him adequate medical care in violation of

the Eighth Amendment during his confinement in the Henrico Regional Jail East.

Specifically, in his Particularized Complaint ("Complaint," ECF No. 16), Blackwell

contends that Defendants provided him with inadequate medical care because:[1]

Claim One:    Defendants denied Blackwell adequate medical care and delayed
                  appropriate treatment for his shoulder pain. (*Id.* at 1–2.)

Claim Two:    Defendants "violate[d] the Code of Virginia, which requires sheriffs
                  and regional jails to act as specified in #1, but in violation of state
                  statutes and state constitution." (*Id.* at 1–2.)

Blackwell requests an unspecified amount of damages. (*Id.* at 6.) The matter is before

the Court on the Motion for Summary Judgment filed by Defendants. (ECF No. 29.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system. The Court
corrects the spelling, capitalization, and punctuation in the quotations from the parties'
submissions.

Blackwell has responded. (ECF Nos. 33, 34, 38.) For the reasons set forth below, the Motion for Summary Judgment (ECF No. 29) will be granted.

## I.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is

2

literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Motion for Summary Judgment, Defendants submit the declaration of Michael Smithers (ECF No. 30–1), who attests that the hundreds of pages of medical records attached (ECF Nos. 30–2, 30–3, 30–4), are true and correct;  the declaration of Defendant Inna Tarasova N.P. (ECF No. 30–5); the declaration of Defendant Cane (ECF No. 30–6); and a copy of correspondence pertaining to an outside orthopedist appointment for Blackwell.  (ECF No. 30–7).

At this stage, the Court is tasked with assessing whether Blackwell "has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added).  As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324.  Although Blackwell filed several responses to the Motion for Summary Judgment, none are sworn to under penalty of perjury, and therefore, fail to constitute admissible

evidence.[2]  Blackwell also submitted an unsworn Particularized Complaint.  Because

Blackwell failed to swear to the contents of his Particularized Complaint under penalty of

perjury, the Particularized Complaint also fails to constitute admissible evidence.  *See*

*United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004).  Blackwell's failure to present

any evidence to counter Defendants' Motion for Summary Judgment permits the Court to

rely solely on Defendants' submissions in deciding the Motion for Summary Judgment.

*See Forsyth*, 19 F.3d at 1537; Fed. R. Civ. P. 56(c)(3) ("The Court need only consider the

cited materials . . . .").[3]

---

[2] Blackwell has been warned three times during the pendency of this action of the manner in which he must respond to the Motion for Summary Judgment.  First, in the Court's February 11, 2021 Memorandum Order serving the action the Court explained:

> Plaintiff is advised that the Court will not consider as evidence in opposition to any motion for summary judgment a memorandum of law and facts that is sworn to under penalty of perjury.  Rather, any verified allegations must be set forth in a separate document titled "Affidavit" or "Sworn Statement," and reflect that the sworn statements of fact are made on personal knowledge and that the affiant is competent to testify on the matter stated therein.  *See* Fed. R. Civ. P. 56(c)(4).

(ECF No. 19 at 2.)  Subsequently, accompanying the Defendants' Motion for Summary Judgment was a notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), that once again reminded Blackwell of his obligations.  (ECF No. 29 at 1–2.)  Finally, Defendants filed a Reply to Blackwell's two Responses to the Motion for Summary Judgment, and specifically pointed out to Blackwell that he had "failed to provide sworn affidavits or statements as required by Fed. R. Civ. P. 56(c)(4) and the Court's prior order.  (ECF No. 36 at 3 (citation omitted).)  Although Blackwell responded to that Reply, he failed to submit an affidavit or any other evidence in support of his claims.

[3] Blackwell repeatedly suggests that the Court should have obtained certain medical records on his behalf because he signed a waiver to release the records and that those records would prove his point.  (*See, e.g.*, ECF No. 39 at 2; ECF No. 39–1 at 3.)  Contrary to Blackwell's suggestion, it was incumbent on Blackwell to obtain and file with the Court any medical records that he believes support his claim.  The Court will not seek out or obtain records for him.  Moreover, attached to his third Response to the Motion for Summary Judgment and to Defendants' Reply, he has provided a copy of the Defendants' Reply annotated, and an Inmate Request Form.  (ECF No. 39–1 at 1–2.)  However, "[i]t is well established that unsworn, unauthenticated documents

In light of the foregoing submissions and principles, the following facts are established for the Motion for Summary Judgment. All permissible inferences are drawn in favor of Blackwell.

## II.   UNDISPUTED FACTS

As a preface, the Court notes that the medical record in this action is very lengthy because Blackwell complained frequently about his shoulder, at some points nearly every day. However, despite his frequent requests and apparent dissatisfaction with the prescribed treatment, the record reflects that Blackwell received a great deal of medical care for his shoulder between November 2019 and April 2021.

Blackwell has been detained in the Henrico Regional Jail East since November 8, 2019. (ECF No. 30–2 at 1.) Nurse Tarasova explains that if an inmate is not feeling well, he can submit an inmate request that is sent to a nurse for review. (ECF No. 30–5 ¶ 3.)[4] A nurse then determines whether the medical complaint requires further assessment by either the jail physician or nurse practitioner, such as Dr. Cane or herself. (*Id.*)

---

cannot be considered on a motion for summary judgment." *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) (citation omitted). "For documents to be considered, they 'must be authenticated by and attached to an affidavit' that meets the strictures of Rule 56." *Campbell v. Verizon Va., Inc.*, 812 F. Supp. 2d 748, 750 (E.D. Va. 2011) (quoting *Orsi*, 999 F.2d at 92). In the end, even if the Court considered the Inmate Request Form, it would not change the Court's conclusion that Defendants were not deliberately indifferent because Blackwell received a great deal of medical care.

[4] Nurse Tarasova avers that she "do[es] not personally handle the intake of inmate sick requests." (*Id.* ¶ 4.)

### A.    Medical Care in 2019

On November 19, 2019, Blackwell refused a routine physical examination. (ECF No. 30–3 at 15.) On December 3, 2019, Nurse Tarasvova treated Blackwell for hypertension and chronic care. (ECF No. 30–5 ¶ 5.) Blackwell also noted a "history of chronic left shoulder pain that increased in pain the last 3 to 4 days due to being cold." (*Id.*) Nurse Tarasova prescribed acetaminophen for Blackwell's shoulder pain, "instructed him to continue with his exercise," and instructed him to follow-up in ninety days as needed. (*Id.*; *see* ECF No. 30–2 at 95.)

On December 6, 2019, Blackwell submitted his first inmate sick call request form requesting that the medical department stop ordering pills for him. (ECF 30–3 at 16.) Blackwell indicated on the form: "I will take what I have and that will be it." (*Id.*) Dr. Cane approved this request. (ECF No. 30–2 at 174.)

### B.    January and February 2020

Blackwell submitted his next request on January 14, 2020. (ECF No. 30–3 at 17.) Blackwell complained that he had been experiencing pain in his shoulder for a month and needed something more than aspirin. (*Id.*) The nurse provided Blackwell with Tylenol. (*Id.*) On January 16, 2020, Blackwell submitted an inmate sick call request to see the doctor for his left shoulder "as soon as possible," because "it keeps [him] up all night." (*Id.* at 18.) Blackwell was examined by Nurse Tarasova that same day. (ECF No. 30–2 at 98.) Blackwell complained that he had pain in his left shoulder that continued up to his neck. (*Id.*; *see* ECF No. 30–5 ¶ 6.) Blackwell indicated that he had pain for years and never went to a doctor for it. (ECF No. 30–2 at 98; *see* ECF No. 30–5 ¶ 6.) Blackwell

6

also reported a history of "many car accidents." (*Id.* at 98; *see* ECF No. 30–5 ¶ 6.) Nurse Tarasova conducted a physical examination that revealed that Blackwell was in no distress. (ECF No. 30–5 ¶ 6.) Nurse Tarasova noted that "Blackwell was able to fully abduct his left arm, but with pain." (*Id.*) In response, Nurse Tarasova increased his Tylenol dose, ordered capsaicin cream and an extra towel, and ordered an X-ray to rule out any underlying abnormalities. (*Id.*) Nurse Tarasova also offered Blackwell acupuncture sessions for his pain, but he refused. (*Id.*)

On January 17, 2020,[5] Blackwell had an X-ray taken of his left shoulder.  Dr. Cane reviewed the X-ray and noted that the "X-ray revealed a non-acute AC separation. An AC separation is when the clavicle and scapula are separated/missing cartilage.  Non-acute refers to an old injury that is chronic and develops over time." (ECF No. 30–6 ¶ 4; *see* ECF No. 30–2 at 99.) Nurse Tarasova explained that "[n]on-acute separations are generally treated through exercise and medicine." (ECF No. 30–5 ¶ 7.)

On January 26, 2020, Blackwell submitted an inmate sick call request asking about the results of his X-ray. (ECF No. 30–3 at 19.) A nurse responded that the "x-ray show[ed] no acute changes per provider." (*Id.*) On January 30, 2020, Blackwell submitted an inmate sick call request reporting that he had not received "my blanket or

---

[5] The X-ray was taken on this date according to medical records. (ECF No. 30–3 at 10.) Both the Brief in Opposition and Tarasova's declaration reflect two different incorrect dates.

    The Court notes that there are many scrivener's errors by counsel for Defendants in the dates and cites to page numbers in the medical record.  The Court has corrected these errors from its review of the medical records.  In some, but not all instances, the Court has noted these discrepancies.  In the future, counsel is warned that the Court will deny without prejudice any motion that contains this level of typographical error and will direct counsel to correct these errors before the Court will consider the motion.

my rub on for pain in my shoulder." (*Id.* at 20.) A nurse responded that Blackwell had

been referred to a medical provider. (*Id.*) On February 14, 2020, Blackwell submitted a

request to see the doctor about his left shoulder because of the pain. (*Id.* at 21.) The

nurse informed Blackwell that he was already on the list to see a medical provider for a

follow-up and Tylenol was added to his cart. (*Id.*) The following day, on February 15,

2020, Blackwell submitted yet another request about his shoulder pain, noting that he was

having trouble putting his clothes on because it hurt and requesting an MRI. (*Id.* at 22.)

The nurse again advised Blackwell that he was on the list to see a provider for a follow-

up visit. (*Id.*) On February 21 and 25, 2020, Blackwell submitted requests asking for

heating pads for his pain. (*Id.* at 23–24.) A nurse responded that medical does not

provide heating pads and that he was on the list to see a doctor. (*Id.*)

   **C.     March 2020**

   On March 2, 2020, Blackwell submitted two inmate requests asking to see the

doctor and was scheduled for a sick call visit the following day. (*Id.* at 25–26; *see* ECF

No. 30-2 at 131.) On March 3, 2020, Blackwell was a "no show" when he was called for

treatment. (*Id.* at 25–26; *see* ECF No. 30-2 at 131.) On March 9, 2020, Nurse Tarasova

treated Blackwell for his complaints of left shoulder pain and numbness. (ECF No. 30–5

¶ 8.) Blackwell denied any recent injury and stated that he probably received the AC

separation years ago when he was a teenager. (ECF No. 30–5 ¶ 8.) Nurse Tarasova

conducted a physical examination of Blackwell "which revealed no edema (swelling) or

obvious deformity," but she "noted that his muscle mass was slightly decreased on the

left shoulder." (*Id.*)  Nurse Tarasova prescribed "Celebrex and advise[d] Blackwell to complete range of motion ("ROM") exercises." (*Id.*)

On March 12, 2020, Blackwell submitted a request asking for pain relief cream, indicating that his left shoulder "hurts so bad that [he] can't sleep," and asking to see the doctor. (ECF No. 30–3 at 27.)  The nurse responded that he had just been seen by the nurse practitioner on March 9, 2020, that she had ordered medication for his shoulder pain, and Blackwell had been advised to do certain exercises. (*Id.*)  A refill for Voltaren pain gel was also sent to the pharmacy. (*Id.*; ECF No. 30–2 at 132.)

Blackwell submitted a variety of inmate requests between March 16, 2020 and March 22, 2020, complaining of pain and numbness and requesting to see a doctor. (ECF No. 30–3 at 28–36.)  The nurse noted again that Blackwell had just been seen on March 9, 2020 by a provider, he had been prescribed medicine, that his X-ray was normal, and that "[n]o further treatment [was] necessary." (*See, e.g., id.* at 33.)

Nevertheless, on March 23, 2020, Dr. Cane treated Blackwell for shoulder pain. (ECF No. 30–6 ¶ 4.)[6]  Dr. Cane "noted that Blackwell could have a possible rotator cuff injury and ordered an MRI of the left shoulder.  Unfortunately, access to outside facilities were limited due to the COVID–19 pandemic." (*Id.*)  Between March 24 and March 31, 2020, Blackwell submitted two requests asking for capsaicin cream for his left shoulder. (ECF No. 30–3 at 38–39.)  The nurse noted that the cream had been ordered and that Blackwell would receive it when it arrived from the pharmacy. (*Id.* at 38.)

---

[6] It is unclear whether Dr. Cane saw Blackwell on March 20, 2020 or March 23, 2020. (*See* ECF No. 30–2 at 101–02, 134.  *But see* ECF No. 30–3 at 35.)

9

### D.    April and May 2020

On April 1, 2020, Blackwell requested a refill for acetaminophen. (*Id.* at 40.) The request was sent to Dr. Cane who ordered it on April 2, 2020. (ECF No. 30–2 at 184.) On April 2, 2020, Dr. Cane saw Blackwell via a telehealth appointment for his hypertension. (ECF No. 30–6 ¶ 5; *see* ECF No. 30–2 at 135.) Blackwell also complained of left shoulder pain. (ECF No. 30–6 ¶ 5.) Dr. Cane again confirmed with Blackwell that the results of an X-ray revealed a non-acute injury and did not reveal any fractures. (*Id.*) Dr. Cane ordered an MRI for "when jail resumes outside appts." (ECF No. 30–2 at 135.)

On April 4, 2020, Blackwell submitted a request complaining that he is in pain every day and did not have any pain cream. (ECF No. 30–3 at 42.) The nurse advised Blackwell that the medication was sent to him on "pill pass" by the nurse. (*Id.*) On April 5, 2020, Blackwell submitted yet another request complaining of left shoulder pain and asking about the status of his MRI. (*Id.* at 43.) A nurse advised Blackwell once again that the MRI was ordered for when "the facility has an appointment available." (*Id.*)

On April 6, 2020, Blackwell submitted a request asking for stronger medicine. (*Id.* at 45.) The nurse advised Blackwell that he had been prescribed the highest dose of Tylenol. (*Id.*) On April 7, 2020, Blackwell filed several additional requests related to pain in his arms. (*Id.* at 46–49.) The nurse advised Blackwell that his complaints had already been addressed during his April 2, 2020 appointment with Dr. Cane. (*Id.*) In an inmate request Blackwell filed on April 9, 2020, the nurse once again reminded

Blackwell that he was just seen by Dr. Cane on April 2, 2020 and that an MRI was ordered for when the jail resumes outside appointments. (*Id.* at 50.)

On April 10, 2020, Blackwell requested that his dose of Tylenol be increased from 500 mg to 800 mg or that he be prescribed something stronger. (ECF No. 30–4 at 3.) In response, Blackwell was prescribed 800 mg of ibuprofen. (ECF No. 30–2 at 2.)

Between April 13, 2020 and May 4, 2020, Blackwell filed several inmate requests pertaining to his prescribed medications. (ECF No. 30–4 at 5–8.) Blackwell's complaints were addressed by either refilling his medications or advising him when each medication could be refilled. (*See id.*) On May 9, 2020, Blackwell again requested stronger medicine for his shoulder pain. (*Id.* at 9.) A nurse responded that he was receiving 800 mg of ibuprofen twice a day and until he finished that prescription nothing else could be ordered. (*Id.*) During the remainder of May, Blackwell submitted several additional requests for refills of medications or complaints about his medications. (ECF No. 30–2 at 60–63.) Specifically, on May 25, 2020, in response to Blackwell's ongoing complaints of pain and requests for stronger medicine, a nurse responded that the "issue [had been] addressed multiple times" and that Blackwell was "already on Celebrex, Ibuprofen and muscle rub." (ECF No. 30–4 at 11.) On May 27, 2020, when Blackwell submitted yet another request for stronger medication than Tylenol and alleged that he "ha[d] sent multiple requests with no response," a nurse responded: "Mr. Blackwell, I have submitted your request to the MD. Please note, that you do not have an order for Tylenol 500 mg. You have an order for Ibuprofen 800 mg . . . along with the muscle rub." (*Id.* at 12.)

E.    **June and July 2020**

On June 1, 2020, Blackwell submitted a request indicating that "I would like to get my meds at nights because I do not get any sleep at night and I be [as]leep in the morning when they call pill call." (*Id.* at 14.)  In response, Blackwell's request was referred to a medical provider. (*Id.*)

On June 5, 2020, Nurse Tarasova treated Blackwell for his shoulder pain and his complaints that he was having trouble sleeping. (ECF No. 30–5 ¶ 9.)  She noted that Blackwell was in "no distress" and had a "long history of shoulder pain." (*Id.*)  In response to his complaints of pain, Nurse Tarasova "prescribed him Tylenol KOP, muscle rub, referred him to an orthopaedic doctor, and increased his dose [of] Celebrex." (*Id.*)

On June 19, 2020, Blackwell was evaluated at Tuckahoe Orthopaedics. (ECF No. 30–2 at 106.)  Blackwell received physical therapy and was taught physical therapy exercises to do on his own. (*Id.* at 5, 106; *see* ECF No. 30–3 at 13.)

On July 7, 2020, Blackwell was sent to West Point Physical Therapy for evaluation, for a physical therapy session, and to be taught home exercises for his left shoulder pain. (ECF No. 30–2 at 161.)  That same day, Blackwell submitted an inmate request asking why he was sent to "REHAB" and also asking for the results of his X-rays. (ECF No. 30–4 at 16.)  Blackwell was referred to a medical provider at the jail. (*Id.*)

On July 13, 2020, Dr. Cane evaluated Blackwell for his ongoing complaints of shoulder pain. (ECF No. 30–2 at 107.)  Blackwell noted that his pain was worsening

12

with the physical therapy exercises.  (*Id.*)  Dr. Cane examined Blackwell and noted that

Blackwell had "[s]evere progressive left shoulder pain.  Possible Adhesive Encapsulitis"

as opposed to rotator cuff problems.  (*Id.*; *see* ECF No. 30–6 ¶ 6.)[7]  As a result, Dr. Cane

ordered an MRI and noted that he would see Blackwell in the clinic after the results of

the MRI.  (ECF No. 30–2 at 107.)

> **F.     August and September 2020**

On August 3, 2020, Blackwell was sent to Sentara Williamsburg Regional for an

MRI of his left shoulder.  (*Id.* at 163; ECF No. 30–3 at 11.)  Dr. Cane explains that the

MRI report "revealed that Blackwell had a low grade partial thickness tear of his rotator

cuff."  (ECF No. 30–6 ¶ 7.)[8]  Dr. Cane further explains that

> [t]here are varying degrees of tears.  Blackwell had a partial tear to one out
> of the four rotator cuff muscles.  As such, it is described as a "low" grade
> partial tear.  Low grade tears are normally treated conservatively with
> exercises, physical therapy and then injections.  Generally, partial tears do
> not require surgery.

(*Id.*)  Blackwell's MRI report was also reviewed by Tuckahoe Orthopaedics.  (*Id.* ¶ 8.)

According to Dr. Cane, "the orthopedic doctor determined that Blackwell's low grade

partial tear was not an emergency injury and did not require surgery."  (*Id.*)  The

orthopedist also noted that "nothing jumped out at him from the report."  (ECF No. 30–2

at 166.)  However, "[d]ue to administrative reasons, Blackwell was referred to MCV for

future treatment."  (ECF No. 30–6 ¶ 8.)

---

[7] The Court notes that Dr. Cane's declaration has the incorrect date for his examination of
Blackwell per the medical records.

[8] The Court notes that Dr. Cane's declaration has the incorrect date for Blackwell's MRI per the
medical records.

After receiving the MRI report, on August 17, 2020, Dr. Cane evaluated Blackwell through telehealth because of the COVID–19 restrictions.  (ECF No. 30–2 at 166.)

On August 21, 2020, Blackwell complained of symptoms consistent with COVID–19, and on August 24, 2020, he was confirmed to be positive.  (*Id.*)  On September 2, 2020, Nurse Tarasova attempted to see Blackwell, but was not permitted to due to COVID–19 restrictions.  (*Id.* at 166–67.)  However, during that time, Blackwell continued to submit requests concerning his medications all of which were addressed by medical staff.  Blackwell's prescriptions were either refilled or Blackwell was informed of the date upon which they could be refilled.  (ECF No. 30–4 at 25–28.)

On September 23, 2020, Nurse Tarasova "saw Blackwell for chronic care, hypertension and reported sarcoidosis."  (ECF No. 30–5 ¶ 12.)  Blackwell also complained about left shoulder pain.  (*Id.*)  Nurse Tarasova provided Blackwell with exercises to do and he was instructed to follow up in the clinic in six weeks if needed.  (*Id.*)

On September 28, 2020, Blackwell was sent to the VCU Medical Center ("MCV") orthopedics clinic for treatment of his left shoulder.  (ECF No. 30–2 at 4, 165; ECF No. 30–6 ¶ 9.)  Dr. Cane reviewed the MCV records and noted that Blackwell was diagnosed "with an AC joint separation," was instructed to follow up as needed, and that no restrictions were noted.  (ECF No. 30–6 ¶ 9; *see also* ECF No. 30–3 at 14.)

### G.    October 2020 through February 2021

On October 18, 2020, Blackwell submitted a request to see Dr. Cane concerning his left shoulder.  (ECF No. 30–4 at 30.)  Dr. Cane saw Blackwell on October 21, 2020.

(ECF No. 30–2 at 115.)  Blackwell explained that he had a steroid injection at MCV but that it was wearing off.  (*Id.*)  Dr. Cane referred Blackwell back to MCV orthopedics (*id.* at 4), and he was scheduled for an appointment on December 30, 2020.  (*Id.* at 195.)

Throughout November and December 2020, Blackwell continued to submit inmate requests lodging the same complaints about his left shoulder.  When Blackwell indicated that he was out of medication, his requests were filled by nursing staff.  (*See* ECF No. 30–4 at 31, 35–38.)  When Blackwell repeatedly complained that he "need[ed] to go out and see a doctor about my shoulder," Blackwell was reminded that he was already scheduled to see an outside provider.  (*Id.* at 32–34, 37.)

On December 23, 2020, Dr. Cane received an email that MCV had pushed back Blackwell's appointment to March 1, 2021.  (ECF No. 30–6 ¶ 11; ECF No. 30–7.)  On February 26, 2021, MCV changed the March 1, 2021 appointment to a telehealth appointment and Blackwell was seen that day.  (ECF No. 30–2 at 124; ECF No. 30–6, ¶¶ 11–12.)  Throughout this period, Blackwell continued to complain about his shoulder pain, and that he wanted to see Dr. Cane.  (ECF No. 30–4 at 38–44.)  His requests were forwarded to Dr. Cane who prescribed Diclofenac topical gel for his complaints of pain, and that prescription was later refilled when Blackwell so requested.  (*Id.* at 41–44.)

Following his March 1, 2021 telehealth appointment with MCV, Dr. Cane forwarded the MRI report to MCV to review.  (ECF No. 30–6 ¶ 12.)  At the time of his declaration, Dr. Cane noted that Blackwell was scheduled to be seen again by MCV in April, and as of that date, "it was [his] understanding that no orthopedic has referred Blackwell for surgery."  (ECF No. 30–6 ¶ 13.)

15

## III. ANALYSIS

### A. Fourteenth and Eighth Amendment Principles

From Blackwell's submissions, it is unclear whether he was a convicted felon at the time of his complaints or a pretrial detainee. However, because Blackwell was housed in the Henrico Regional Jail East at the time of his complaints, the Court assumes that he was a pretrial detainee. *See Goodman v. Barber*, 539 F. App'x 87, 89 (4th Cir. 2013).

The rights of a pretrial detainee complaining of inadequate medical care under the Fourteenth Amendment "are at least as great as the Eighth Amendment available to a convicted prisoner." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). To survive a motion for summary judgment on an Eighth Amendment claim, Blackwell must demonstrate that Defendants acted with deliberate indifference to his serious medical needs. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001). A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the

16

> official must both be aware of facts from which the inference could be drawn
> that a substantial risk of serious harm exists, and he must also draw the
> inference.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994). *Farmer* teaches "that general knowledge

of facts creating a substantial risk of harm is not enough. The prison official must also

draw the inference between those general facts and the specific risk of harm confronting

the inmate." *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (citing *Farmer*, 511

U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (stating same). Thus,

to survive a motion for summary judgment, the deliberate indifference standard requires a

plaintiff to demonstrate that "the official in question subjectively recognized a substantial

risk of harm" and "that the official in question subjectively recognized that his actions

were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294,

303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

"To establish that a health care provider's actions constitute deliberate indifference

to a serious medical need, the treatment must be so grossly incompetent, inadequate, or

excessive as to shock the conscience or to be intolerable to fundamental fairness."

*Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d

1052, 1058 (11th Cir. 1986)). Absent exceptional circumstances, an inmate's

disagreement with medical personnel with respect to a course of treatment is insufficient

to state a cognizable constitutional claim, much less to demonstrate deliberate

indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing

*Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). Furthermore, in evaluating a

prisoner's complaint regarding medical care, the Court is mindful that "society does not

expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977). Moreover, "[i]t may not be seriously contended that any prisoner detained for however short a period is entitled to have all his needed elective medical care performed while in custody . . . ." *Kersh v. Bounds*, 501 F.2d 585, 589 (4th Cir. 1974).

## B.    Claim One

### 1.    Blackwell's General Complaints of Denial of Medical Care

Blackwell contends that Defendants denied him adequate medical care for his left shoulder pain. It is not entirely clear why Blackwell believes Defendants violated his Eighth Amendment rights. Blackwell indicates, and the record clearly establishes, that he submitted many complaints for his pain and received a great deal of treatment. Blackwell suggests that "the pain and suffering of this condition could and should have been addressed on first sick call." (ECF No. 16 at 5.) Although Blackwell never explicitly states so, it appears that he faults Defendants for not making his chronic left shoulder pain simply disappear. As discussed in further detail below, Blackwell also seemingly disagrees with the timing and course of care he received, both of which fail to state a claim of deliberate indifference.

As a preliminary matter, Blackwell's complaints about his shoulder pain doubtfully amount to a serious medical need. Blackwell's shoulder injury had been

present since he was a teenager, he informed Nurse Tarasova that he had experienced

pain for years, and that he never went to a doctor for it before he became incarcerated

(ECF No. 30–5 ¶ 6.)[9]  An X-ray and an MRI demonstrated that he had a low-grade partial

tear that could be treated conservatively with physical therapy and medications and did

not require emergent care or surgery.

Even if Blackwell's complaints of shoulder pain amounted to a serious medical

need, the record, however, makes clear that Defendants did not act with indifference to

Blackwell's complaints.  Rather, the record establishes that Defendants were entirely

responsive to Blackwell's medical needs and to his abundant complaints.  Defendants

always responded to his complaints and prescribed Blackwell with a wide variety of

different pain medications to address Blackwell's ongoing complaints of pain including

Celebrex, ibuprofen, Tylenol, Voltaren, Diclofenac and several topical pain rubs.  When

Blackwell notified nursing staff that his prescriptions or medications needed refilling,

Blackwell's medications were reordered.  Defendants scheduled Blackwell for X-rays

and later for an MRI at Sentara hospital.  Defendants scheduled Blackwell for

appointments with an outside orthopedist, who recommended physical therapy and

exercises.  Defendants scheduled Blackwell for a physical therapy session at West Point

Physical Therapy.  When Blackwell indicated that physical therapy was making his pain

worse, Defendants scheduled Blackwell to see a second orthopedist at MCV who

---

[9] Blackwell in an unsworn response, vigorously contends that Nurse Tarasova's declaration is
false, and he never provided her with this information.  However, the contemporaneous medical
records also reflect that Blackwell provided Nurse Tarasova with this information.  (ECF No.
30–2 at 98.)

provided Blackwell with a steroid shot.  That specialist did not indicate that any emergent care or surgery was needed.  When Blackwell continued to complain of pain, Dr. Cane referred Blackwell back to MCV for a follow-up appointment and continued to adjust his medications to address his complaints of pain.  Even if Blackwell disagreed with the prescribed treatment plan, Blackwell was not entitled to the medical care of his choosing. *See Wright*, 766 F.2d at 849 (citations omitted).

Blackwell's main complaint appears to be that Defendants did not make him entirely pain-free.  "It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating.  Those recovering from even the best treatment can experience pain." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).  The Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." *Id.*  So long as medical staff respond reasonably to an inmate's complaints of pain, the inmate's Eighth Amendment rights are not violated. *See Brown*, 240 F.3d at 389–90.  Because the reasonableness of any such response usually calls for a medical judgment, "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes*, 95 F.3d at 592; *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) ("[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" (quoting *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001))).  This is clearly not such an extreme circumstance that judicial interference is warranted.

As described in detail above, Blackwell fails to demonstrate that Defendants acted with deliberate indifference to his complaints of shoulder pain. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (explaining that "types of medication prescribed and referrals to specialists are generally matters of medical judgment"). Rather, at most, Blackwell complains of nothing more than a disagreement with Defendants' professional medical opinions about the appropriate course of treatment, and its timing, and thus, he fails to establish a cognizable constitutional claim. *See Wright*, 766 F.2d at 849.[10]

### 2.   Blackwell's Complaints About a Delay in Care

To the extent that Blackwell faults Defendants for the delay in referring him for an MRI and to outside specialists, he again fails to demonstrate any deliberate indifference. "Where an inmate's inadequate medical care claim is predicated upon a delay in care, the inmate must also establish that the delay in the provision of medical care "resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)); *id.* at 754 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)) (identifying this additional requirement of the objective prong); *see Webb v. Hamidullah*, 281 F. App'x 159, 166–67 n.13 (4th Cir. 2008). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citations omitted); *see Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va.

---

[10] It is not entirely clear what different treatment Blackwell wanted that he was not provided. Rather, Blackwell apparently faults Defendants for not ensuring he was entirely pain-free.

21

1995) (quoting *Monmouth Cty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

Blackwell fails to demonstrate that the delay in arranging consultations with outside specialists caused him substantial harm. Blackwell continuously complained of pain both before, during, and after he was seen by the orthopedists and physical therapists. The nature of his complaints did not change. Neither orthopedist prescribed any emergent care or surgery as treatment but told Blackwell to follow up as needed. For this reason alone, Blackwell's claim lacks merit.

Moreover, Blackwell fails to demonstrate that Defendants had any control over when these outside specialist appointments were scheduled or that the delay was the product of Defendants' deliberate indifference. When Blackwell continued to complain of pain, Dr. Cane continued to refer Blackwell to outside practitioners to address Blackwell's complaints. In March 2020, Dr. Cane ordered an MRI for Blackwell but, at the time, access to outside facilities were limited due to the COVID–19 pandemic. In June 2020, Blackwell was sent to Tuckahoe Orthopaedics where Blackwell was treated with physical therapy and provided with home exercises to alleviate his shoulder pain. In July 2020, Blackwell was sent to West Point Physical Therapy. In August 2020, Blackwell received an MRI of his shoulder. In September 2020, Blackwell was sent to MCV orthopedics for treatment. When Blackwell continued to complain, Dr. Cane referred Blackwell back to MCV orthopedics. However, MCV, not Defendants, postponed Blackwell's appointment.

Here, Blackwell fails to demonstrate that the delay in having an MRI, or arranging the multiple orthopedic consultations caused him substantial harm.[11]  Accordingly, with respect to his complaints about the delay in referring him to a specialist or for an MRI, Blackwell fails to satisfy either the objective or subjective prong for an Eighth Amendment claim.[12]

In sum, Blackwell fails to demonstrate that Defendants were deliberately indifferent to his complaints of shoulder pain.  Accordingly, Claim One lacks merit and will be dismissed.

---

[11] Blackwell contends that certain medical records show that Defendants were deliberately indifferent.  Blackwell alleges that "in May 2020, Plaintiff was transported to Bon Secours Hospital in Hopewell for an MRI, but the jail medical staff had failed to provide hospital with necessary documents so no MRI was performed and instead Plaintiff was given an X-ray of his left shoulder." (ECF No. 16 at 3.)  Defendants note that Blackwell's medical file contains no record of this visit. (ECF No. 30–1 ¶ 3.)  In response Blackwell takes issue with Defendants' statement about there being no record of a May 2020 visit.  Blackwell attaches an inmate request form that he submitted on June 20, 2020 requesting the results of his X-ray *on June 19, 2020*, at Bon Secours. (ECF No. 39–1 at 2.)  The nurse's response indicates that Blackwell would "be referred to the doctor for results from the outside Dr. visit." (*Id.*)  A review of the record very clearly demonstrates that Blackwell was evaluated at Tuckahoe Orthopaedics on June 19, 2020, which is located at Bon Secours St. Mary's Hospital. (ECF No. 30–2 at 106.)  In his second Response to the Motion for Summary Judgment, Blackwell again complains that he was sent to MCV without his records. (ECF No. 34 at 5.)  Assuming Blackwell's allegations are true, and Defendants failed to send his records to Bon Secours in May 2020, and later to MCV, Blackwell still fails to show that any delay in receiving the MRI or any delay in sending his medical records caused him substantial harm.  *Mata*, 427 F.3d at 751.

[12] For the first time in his second Response to the Motion for Summary Judgment, Blackwell complains that he did not see a doctor for three months. (ECF No. 34 at 1.)  He argues that "I know if I had been seen by the doctor sooner than what I had that this matter would be solve[d] and I wouldn't be in the pain that I am in." (*Id.* at 6.)  However, during November 2019 through February 2020, Blackwell received a great deal of medical care.  Blackwell was examined twice by Nurse Tarasova, a Nurse Practitioner, was prescribed various medications for his complaints of pain, received an X-ray that was analyzed by Dr. Cane, and then was referred to Dr. Cane.  Blackwell again fails to demonstrate that any delay in seeing the doctor caused him substantial harm.

23

### C.   Claim Two

In Claim Two, Blackwell contends that Defendants "violate[d] the Code of

Virginia, which requires sheriff's and regional jails to act as specified in [Claim] #1, but

in violation of state statutes and state constitution." (ECF No. 16 at 1–2.) Generally,

pendant state law claims should be dismissed if the federal claims are dismissed before

trial. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). In light of the

preliminary dismissal of Blackwell's constitutional claim and the vagueness of his

purported state law claim, the Court declines to exercise its discretion to retain the state

law claim. *See Jenkins v. Weatherholtz*, 909 F.2d 105, 110 (4th Cir. 1990). Accordingly,

Claim Two will be dismissed without prejudice.

## IV.   CONCLUSION

The Motion for Summary Judgment (ECF No. 29) will be granted. Claim One

will be dismissed with prejudice. Claim Two will be dismissed without prejudice. The

action will be dismissed.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: **Nov. 4, 2021**
Richmond, Virginia